# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

DARNELL WILLIAMS,

              Petitioner,

vs.

JOHN AULT,

              Respondent.

No. C07-3072-MWB

**REPORT AND RECOMMENDATION ON PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254**

---

## I. FACTUAL AND PROCEDURAL BACKGROUND

On October 12, 1998, Darnell Williams was charged in Cerro Gordo County, Iowa, District Court with two crimes: first-degree murder and first-degree robbery. After a jury trial, Williams was convicted on both charges. He was sentenced to life imprisonment on the murder charge, and twenty-five years in prison on the robbery charge. He appealed, and his appeal was referred to the Iowa Court of Appeals, which affirmed his convictions. The Iowa Supreme Court denied his application for further review.

Williams then filed an application for post-conviction relief. After a bench trial, the application was denied. Williams appealed, and his appeal again was referred to the Iowa Court of Appeals. The court affirmed the denial of his PCR application, and the Iowa Supreme Court denied his application for further review.

On October 15, 2007, Williams filed a *pro se* application for habeas corpus relief in this court under 28 U.S.C. § 2254. Doc. No. 3. The court granted his request for appointment of counsel. Doc. No. 2. On July 17, 2008, Williams filed a brief on the merits and a request for an evidentiary hearing. Doc. No. 21. On July 24, 2008, this action was referred to the undersigned for submission of a report and recommended disposition of the case. Doc. No. 25. On November 17, 2008, the respondent ("the State") filed its merits brief. Doc. No. 31. Williams filed a reply brief on January 4, 2009. Doc. No. 34. Telephonic arguments on the application were held on December 17,

2009. Williams and his attorney, Donna M. Schauer, participated in the conference call. The State was represented by Iowa Assistant Attorney General Richard J. Bennett. On January 11, 2010, with leave of court, Williams filed a "Summary of Intended Trial Testimony."[1] Doc. No. 42. On January 15, 2010, the State filed a resistance to Williams's request for an evidentiary hearing. Doc. No. 43.

The factual background of the case was summarized by the Iowa Court of Appeals in its opinion on Williams's direct appeal, *see State v. Williams*, 2000 WL 1827168 (Iowa Ct. App. Dec. 13, 2000) ("*Williams I*"), and again in its opinion on his post-conviction appeal, *see Williams v. State*, 728 N.W.2d 851 (Table), 2007 WL 108342 (Iowa Ct. App. Jan. 18, 2007) ("*Williams II*"). Absent rebuttal by clear and convincing evidence, this court presumes that any factual determinations made by the Iowa courts were correct. 28 U.S.C. § 2254(e)(1). As no such rebuttal has been made, the court adopts the factual findings of the Iowa Court of Appeals. *See Bell v. Norris*, 586 F.3d 624, 630 (8th Cir. 2009) (a federal court must deem factual findings by the state court to be presumptively correct, subject to disturbance only if proven incorrect by clear and convincing evidence).

In its opinion on Williams's direct appeal, the Iowa Court of Appeals summarized the facts of the case as follows:

> The charges [against Williams] stemmed from the robbery and shooting death of Bruce Vrchota in his home in the early morning hours of July 27, 1998. At approximately 1 a.m. on July 27, Williams was attending a party at Vanette Taylor's house. Velena Taylor, Vanette's sister, was also at the party and observed Micheal [sic][2] Williams enter the house and then

---

[1]During oral arguments, the court granted Williams permission to file an affidavit outlining what his testimony would have been had he testified at trial. The "Summary," Doc. No. 42, is only in part an outline of what his testimony would have been – for the most part, it contains legal argument. Nevertheless, the court will consider the "Summary" in its entirety.

[2]In *Williams I*, the Iowa Court of Appeals spelled the name "Micheal." In *Williams II*, the name is spelled "Michael." Cerro Gordo County District Court records indicate the correct spelling of the name is "Michael."

2

leave quickly. She testified Darnell Williams left the party approximately five minutes after Micheal [sic] Williams departed.

A short time later, three men dressed in dark clothing arrived near Bruce Vrchota's home. Two of the men entered the house, apparently looking for drugs and a cash box Vrchota kept on the premises. Vrchota's son, Shelley, was in the house at the time. During the course of the incident, Micheal [sic] Williams shot and killed Vrchota. Shelley positively identified Micheal [sic] Williams as the man wielding the gun and the one who shot his father. He did not see the second man's face because Micheal [sic] Williams ordered Shelley to lay face down on the couch. Shelley was able to observe the back of the second man's neck and testified the second man in his house had dark skin, similar to that of an African-American. Mark Greiman also participated in the incident, but remained outside of the house when Vrchota was shot. After shots were fired, Robert Sansgaard, a friend of one of Vrchota's neighbors, observed the three men running from the scene. The last man to run away from the house turned and fired a shot at Sansgaard.

The three men arrived at Sheyanne Oudekerk's house at approximately 2:00 a.m. She knew Micheal [sic] Williams and Greiman, and later identified Darnell Williams in a photo array as the man with them the night of the murder. She drove all three men to Guy Fisher's apartment where Micheal [sic] Williams hid the gun used to kill Vrchota. Micheal [sic] Williams and Greiman were arrested separately soon after the incident. Darnell Williams was arrested on September 28, 1998.

*Williams I*, 2000 WL 1827168 at *1.

The PCR appellate court summarized the facts of the case as follows:

At around 1:00 a.m. on July 27, 1998, Darnell Williams and his brother,[3] Michael Williams, visited the home of Vanette

---

[3]From the record, it is clear that Darnell Williams and Michael Williams are not brothers, and in fact are not even related, so the court will disregard this finding.

3

Taylor. Her sister, Velenda Taylor, was at the home at the time. Velenda testified Michael Williams only stayed a short time and Darnell Williams left almost immediately after Michael Williams left. She further testified Darnell Williams was wearing black clothes.

At approximately 1:44 the same morning, Darnell and Michael Williams entered [Bruce] Vrochta's home with the intention of robbing him. Mark Grieman waited outside. They discovered Vrochta watching television with his son, Shelley. Darnell Williams watched Shelley while Michael Williams took Vrochta into another room to get money. Two shots were fired, killing Vrochta. The men then fled the house. Vrochta's neighbor, Robert Sansgaard, came out of his house, and Michael Williams fired his gun at Sansgaard. Sansgaard testified at trial that the African-American male leaving the house who did not fire the gun had the same physical build as Darnell Williams.

Darnell and Michael Williams are African-American. Shelley Vrochta did not see the face of the man who watched him while his father was killed, but testified he was African-American because he saw the back of his neck. Shell[e]y Vrochta also testified that he knew Darnell Williams from high school and that the man who stayed in the room with him had the same skin coloring and build as Darnell Williams. Both men wore black clothing.

Sheyanne Oudekerk testified that at approximately 2:00 a.m., Michael Williams, Mark Greiman, and Darnell Williams, came to her home asking for a ride. She took them to the home of Guy Fischer, where the murder weapon was later recovered.

Two of Darnell Williams's fingerprints were found in Vrochta's home. At trial, Williams's attorney claimed the fingerprints were left in the home on an earlier occasion when he was buying marijuana from Vrochta. Counsel argued Williams was not the third man involved in the robbery, but that it was a case of mistaken identity.

*Williams II*, 2007 WL 108342 at *1.

Before trial, Williams filed a motion to suppress any testimony by Sheyanne Oudekerk identifying Williams as the person who was in the company of Michael Williams and Mark Greiman shortly after the murder. Williams argued that a photo lineup displayed to Oudekerk by law enforcement officers was impermissibly suggestive and tainted, and therefore was in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. After a hearing, the trial court denied the motion, holding the photo lineup was not impermissibly suggestive and did not give rise to a substantial likelihood of irreparable misidentification. Oudekerk was permitted to testify at trial about her identification of Williams.

In his direct appeal, Williams raised seven issues, six of which are relevant here:

> Issue 1. The court erred in failing to instruct the jury as to the unreliability of cross racial identification in evaluating identification testimony.

> Issue 2. The court erred in failing to grant defendant's motion to suppress with respect to the identification testimony of Sheyanne Oudekerk.

> Issue 3. The court erred in allowing into evidence testimony of William Basler and Frank Stearns concerning a hypothetical question put to the defendant concerning the extent of Mark Greiman's participation in the alleged crime and testimony of William Basler and Frank Stearns concerning the defendant's alleged reactions and responses to said hypothetical question.

> Issue 4. The court erred in allowing into evidence the testimony of Romie Williams with respect to an alleged drug sale by the defendant.

> Issue 5. The verdict was contrary to the law and the weight of the evidence due to the state's failure to prove defendant was the individual who accompanied Michael Williams to the Vrchota home; the state's failure to prove defendant aided and abetted commission of a robbery; and the state's failure to prove that the shooting which resulted in Bruce Vrchota's death could reasonably be expected to occur in aiding the commission of the robbery.

* * *[4]

Issue 7. The defendant received ineffective assistance of trial counsel.

Appellant's Brief, *State v. Williams*, No. 99-1312, at iii-iv (Iowa Sup. Ct. July 27, 2000) (citations omitted).

The appellate court affirmed Williams's convictions. On Issue 1, the court ruled that the trial judge did not abuse his discretion when he refused to instruct the jury on the shortcomings of cross-racial identification. The court pointed out that the defense was permitted to call an expert witness at trial to testify as to the infirmities of cross-racial identification, and Williams's attorney argued this issue to the jury during closing arguments. On Issue 2, the court agreed with the trial judge's findings that the photo array was not impermissibly suggestive and that there was no substantial likelihood of irreparable misidentification. On Issue 3, the court agreed with the trial judge that the challenged testimony was not hearsay. On Issue 4, the court held the trial judge did not abuse his discretion when he allowed into evidence testimony regarding an alleged drug sale by the defendant, and agreed with the trial court that the probative value of the evidence outweighed its prejudicial effect. On Issue 5, the court held there was sufficient evidence to support Williams's convictions for first-degree robbery and first-degree murder.

Williams argued in Issue 7 that his trial counsel were ineffective in (a) failing to preserve error on the claims he made in his motion in limine and his motion to suppress; (b) failing to have the victim's house searched for Williams's fingerprints in rooms where the crimes had not occurred; and (c) failing to fully investigate other witnesses who possibly could have provided exculpatory testimony. The appellate court concluded Williams could not show prejudice on the first of these claims – that his trial counsel were ineffective in failing to preserve error on certain issues – because the appellate court

_____

[4]Issue 6 concerned the constitutionality of the trial judge's restitution order, and is not relevant to this section 2254 action.

addressed all of these issues on the merits. The court preserved Williams's remaining ineffective assistance of counsel claims for possible postconviction relief proceedings.

Williams filed an Application for Further Review by the Iowa Supreme Court, raising just three issues: (1) "The Court of Appeals erred in finding defendant was not entitled to a jury instruction specifically recognizing the complexities and difficulties involved with cross racial eyewitness identification"; (2) "The Court of Appeals erred in not suppressing the identification of Sheyanne Oudekerk"; and (3) "The Court of Appeals erred in finding there was sufficient evidence to support the conviction, and that the weight of the evidence supported denial of defendant's motion for a new trial." Appellant's Application for Further Review, *State v. Williams*, No. 99-1312, at 2, 4 & 7 (Iowa Sup. Ct. Jan. 3, 2000). In a one-line order entered on March 2, 2001, the Iowa Supreme Court denied the application.

In his application for postconviction relief, Williams initially raised two issues: (1) "[the] specific intent instruction violates the Due Process Clause of the Fourteenth Amendment to the U.S. Federal Constitution"; and (2) "[the] alternative theories instruction deprived [Applicant] of [his] Sixth and Fourteenth Amendments [rights] to [a] fair trial and fundamental fairness." In a memorandum attached to the Application, he raised two more issues: (3) he "was deprived of a constitutionally sound and or, fundamentally fair, jury determination on or of, his guilty acts, and verdict therefrom"; and (4) his "constitutional right to a [fundamentally fair] trial was violated." Williams amended his application to assert four additional issues: (5) "The Court's error in submitting the jury instruction(s) regarding 'Specific Intent' [w]as violative of the due process clause of the 14th Amendment to the U.S. Federal Constitution"; (6) "The Court's error in submitting the jury instruction(s) regarding 'Alternative Theories' [w]as violative of the 6th and 14th Amendments to the U.S. Federal Constitution and fundamental fairness"; (7) "Ineffective assistance of trial counsel in failing to object to and properly preserve error regarding the Court's submission of jury instruction(s) pertaining to

'Specific Intent' and 'Alternative Theories'; in failing to adequately investigate the facts of the Applicant's case, failing to locate certain witnesses identified as material by the Applicant and in failing to call certain material witnesses to testify at trial on Applicant's behalf which would have established the Applicant's innocense"; and (8) "Ineffective assistance of appellate counsel in failing to timely recognize and raise on appeal error committed by trial counsel in not objecting to or properly preserving error regarding the 'Specific Intent' and 'Alternative Theories' instructions."

In his second amended application for postconviction relief, Williams raised six additional issues: (9) "Ineffective assistance of trial counsel in failing to adequately advise the Applicant prior to trial of the practical ramifications and legal consequences of not testifying on his own behalf during the trial and therefore, the Applicant's decision not to testify was not made intelligently or voluntarily and he was unable to assist in his own defense"; (10) "Ineffective assistance of trial counsel in failing to adequately prepare for and conduct cross examination of the State's witnesses by reviewing prior trial testimony of each of the State's witnesses for inconsistent statements made during the Co-Defendant's trial"; (11) "Ineffective assistance of trial counsel by failing to make application to enforce the State's plea offer which was conditioned only upon the Applicant's compliance in providing truthful testimony against a Co-Defendant by [proffer] which condition was performed by the Applicant to his detriment and in reliance upon the State's offer"; (12) "Ineffective assistance of trial counsel in failing to recognize and explain to the Applicant and to take the available action against the State upon violations of the Applicant's due process rights as guaranteed under the 5th and 14th Amendments to the U.S. Federal Constitut[ion] given that the State revoked the plea offer after the Applicant had accepted the offer, complied with the terms of the agreement and relied on the offer to his detriment"; (13) "Ineffective assistance of trial counsel in failing to recognize and to argue in pre-trial motions that the confrontation clause of the 6th Amendment to the U.S. Federal Constitution would be violated by the introduction of statements made to and

by the Applicant during an interrogation by Special Agent Bosler, as the Applicant would not be permitted to cross examine the Co-Defendant who allegedly made a statement to Special Agent Bosler who then questioned the Applicant as to the truth of the Co-Defendant's statement, which was ultimately allowed into evidence at the Applicant's trial without the Co-Defendant's presence"; and (14) "Ineffective assistance of Appellate Counsel in failing to recognize and raise on appeal the additional issues and grounds for reversal alleged herein by Counts IX through XIII not adequately addressed, or not addressed at all, by Applicant's trial counsel."

On August 14, 2002, the PCR court entered an "Order for Partial Summary Dismissal" implementing a stipulation of the parties dismissing Williams's claims alleging ineffective assistance of trial counsel in: "(1) failing to adequately object to the Court's jury instructions relating to the unreliability of cross racial identification; (2) failing to adequately preserve error regarding the Court's ruling on the identification testimony suppression; (3) failing to properly preserve error regarding evidence testimony about his reaction to a question regarding the crime; and (4) failing to preserve error regarding the introduction of evidence testimony of his alleged drug use." Order for Partial Summary Dismissal, No. PCCV059804, at 1-2 (Cerro Gordo County Dist. Ct., June 1, 2005). In the same order, the court granted the State's motion to dismiss PCR Issue 1, the due process challenge to the specific intent instruction; Issue 2, the due process challenge to the alternative theories instruction; Issue 3, the claim that Williams was deprived of a constitutionally sound jury determination; and Issue 4, the claim that Williams's right to a fundamentally fair trial was violated.[5] *Id*. at 3.

The remaining PCR claims came on for hearing on May 4, 2005, but at the commencement of the hearing, Williams abandoned all but the following three claims: "[1] counsel's failure to object to the court's alternative theory instruction; [2] counsel's

---

[5]While not entirely clear, it appears that Issues 2, 3, and 4 all were based on the same argument.

failure to adequately inform him of the ramifications of not testifying; and [3] counsel's failure to attempt to enforce a plea agreement." Ruling on Applicant's Post Conviction Relief, No. PCCV059804, at 2-3 (Cerro Gordo County Dist. Ct., June 1, 2005). The district court ruled against Williams on all three claims.

Williams filed an appeal of the PCR ruling, raising five issues: (1) "Did the District Court err in ruling that Mr. Williams was fairly apprised of the State's theory of the case?" (2) "Whether post conviction counsel was ineffective for failing to claim trial counsel ineffective for failing to object to the jury instructions on the basis that the State effectively improperly amended the trial information to allege a wholly new and different charge, and for failing to claim appellate counsel ineffective for failing to so allege against trial counsel on direct appeal?" (3) "Did the District Court err in concluding trial counsel was not ineffective for failing to move to enforce the plea agreement?" (4) "Did the District Court err in concluding that Mr. Williams was not prejudiced by the [in]effective assistance of trial counsel's failure to adequately discuss with him the pros and cons of defendant Darnell Williams['s] testifying at trial?" (5) "Whether PCR counsel was ineffective for failing to have Mr. Williams testify at the PCR hearing, for introducing defendant's confession as part of the PCR proceedings, and for failing to call Mark Greiman as a witness?" Appellant's Brief, *Williams v. State*, No. 05-1093312, at 1-4 (Iowa Sup. Ct., June 10, 2006).

The Iowa Court of Appeals affirmed the PCR trial court's denial of Williams's PCR Application. *Williams II*, 2007 WL 108342. The court first addressed Williams's claim that his attorneys were ineffective in failing to object to the submission of the theories of aiding and abetting, joint criminal conduct, and felony-murder. Williams argued the defense was not given sufficient notice of those theories prior to trial, and both his trial and appellate counsel were ineffective in failing to object to the trial court's instructing the jury on these alternate theories. The Court of Appeals held the State was under no obligation to specify in the Trial Information which theories it would proceed on at trial, and because

all three theories were supported by the evidence, the trial court ;did not commit error by submitting all of them to the jury.

Addressing Williams's second claim, that his postconviction counsel was ineffective in failing to claim trial counsel was ineffective for failing to object to the jury instructions on the basis that the State improperly amended the trial information to allege a new and different charge, the court affirmed the denial of the claim based on the same reasoning it relied on in affirming the denial of Williams's first claim.

With regard to Williams's third claim, that his trial counsel were ineffective in failing to seek enforcement of the plea agreement after the State withdrew the plea offer, the court agreed with the PCR trial court that the State had the right to withdraw the plea offer because Williams had not complied with the terms of the proffered plea agreement.

The court next addressed Williams's fourth claim, that his trial counsel were ineffective in failing to advise him adequately on his right to testify at his trial. The court agreed with the PCR trial court that because Williams's trial attorneys had not even discussed the issue with him, they had failed to perform an essential duty. However, the court also agreed with the PCR trial court's ruling that Williams had not proved prejudice because there was no reasonable possibility that had Williams testified, he would have been able to overcome the evidence against him.

Williams's fifth claim, that his postconviction counsel was ineffective in several respects, also was rejected by the court.

Williams filed an Application for Further Review by the Iowa Supreme Court in which he raised four issues: (1) "The Court of Appeals erred in concluding that defendant was properly apprised of the State's theory of [the case]"; (2) "The Court of Appeals erred in concluding that trial counsel was not ineffective for failing to move to enforce the plea agreement"; (3) "The Court of Appeals erred in concluding defendant was not prejudiced by trial counsel's breach of the essential duty by failing to discuss with him his right to testify"; and (4) "The Court of Appeals erred in concluding that post conviction counsel

was not ineffective in various respects." Appellant's Application for Further Review, *Williams v. State*, No. 05-1093 (Iowa Sup. Ct. Feb. 8, 2007). In a one-line order entered on March 27, 2007, the Iowa Supreme Court denied the application.

In his brief to this court, Williams has raised sixteen issues:

> Issue One: There was an abuse of discretion and the trial court erred by refusing to instruct the jury on the requested additional language pertaining to the unreliability of cross-racial identification in violation of his 6th and 14th Amendment right to present the theory of his case.

> Issue Two: The trial court erred by failing to suppress identification testimony of Sheyanne Oudekert [sic] in violation of petitioner's 6th and 14th Amendment rights.

> Issue Three: The trial court erred by allowing testimony of officers Basler and Stearns regarding his alleged reaction and response to a hypothetical question concerning another suspect[']s involvement in the case in violation of his 6th and 14th Amendment right.

> Issue Four: The trial court violated Williams['s] 6th and 14th Amendment rights to a fair trial by admitting testimony of an alleged crack cocaine drug sale by petitioner.

> Issue Five: The evidence was insufficient to prove beyond a reasonable doubt that Williams aided and abetted with knowledge or in joint criminal conduct in murder and robbery.

> Issue Six: Trial and appellate counsel were ineffective for failing to object to the fatal variance and constitutional violation exhibited by the trial court's alternative theories for which the defendant was not properly appraised.

> Issue Seven: Trial counsel was ineffective for failing to seek enforcement of the plea offer/agreement.

> Issue Eight: Trial counsel was ineffective for failing to discuss with him, his constitutional right to testify on his own behalf.

> Issue Nine: Direct appeal counsel's ineffective assistance violated William's [sic] 6th and 14th Amendment rights to a fair appeal.

Issue Ten: The trial court erred by instructing the jury on the theory of joint criminal conduct.

Issue Eleven: The trial court erred by presenting the first degree marshaling instruction to the jury, which violated his countervailing policy right and right to notice of specific charges and his right to be heard on the theories of his case.

Issue Twelve: Trial counsel was ineffective in failing to advise him of his rights to testify resulting in a basic constitutional deprivation of a structural nature.

Issue Thirteen: The trial court erred by failing to instruct on and define theft and what the dangerous weapon was.

Issue Fourteen: Trial counsel was ineffective, in general, for failing to object to the defective set of jury instructions.

Issue Fifteen: Direct appellate counsel was ineffective, in general, in violation of his 6th and 14th Amendment rights to[] a fair appeal.

Issue Sixteen: Post conviction and post conviction appellate counsel were ineffective for failing to raise and present the arguments raised in the present pe[t]ition.

Doc. No. 21, pp. 1-2.


## II. STANDARDS FOR EVIDENTIARY HEARINGS

The Supreme Court has noted that "[t]here is no higher duty of a court, under our constitutional system, than the careful processing and adjudication of petitions for writs of habeas corpus, for it is in such proceedings that a person in custody charges that error, neglect, or evil purpose has resulted in his unlawful confinement and that he is deprived of his freedom contrary to law." *Harris v. Nelson*, 394 U.S. 286, 292, 89 S. Ct. 1082, 1086-87, 22 L. Ed. 2d 281 (1969). In certain of these cases, an evidentiary hearing is a necessary part of the process. As the court held in *Harris*, "[i]t is now established beyond the reach of reasonable dispute that the federal courts not only may grant evidentiary hearings to applicants, but must do so upon an appropriate showing." *Harris*, 394 U.S.

at 291, 89 S. Ct. at 1086 (citing *Townsend,* 372 U.S. at 313, 83 S. Ct. at 757; *Brown v. Allen*, 344 U.S. 443, 464, No. 19, 73 S. Ct. 397, 97 L. Ed. 469 (1953)). In the present case, Williams has requested an evidentiary hearing.

The federal *habeas* statute, 28 U.S.C. § 2254, amended as part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), describes what constitutes "an appropriate showing" requiring an evidentiary hearing:

> If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
>
> > (A) the claim relies on –
> >
> > > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> > >
> > > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> >
> > (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

The first inquiry under the statute is whether a petitioner has developed "the factual basis of a claim in State court proceedings." The Supreme Court has explained that where there is a failure to make such a showing because of a lack of diligence or some other fault, a prisoner "must satisfy a heightened standard to obtain an evidentiary hearing." *Williams v. Taylor*, 529 U.S. 430, 433, 120 S. Ct. 1479, 1489, 146 L. Ed. 2d 435 (2000). The threshold question "is not whether the facts [to be presented at the evidentiary hearing] could have been discovered but whether the prisoner was diligent in his efforts . . . [to] search for evidence." *Williams*, 529 U.S. at 435, 120 S. Ct. at 1490. "If there has been

no lack of diligence at the relevant stages in the state proceedings, the prisoner . . . will be excused from showing compliance with the balance of the subsection's requirements." *Williams*, 529 U.S. at 437, 120 S. Ct. at 1491. Preliminarily, then, the court must look to the degree of Williams's diligence in developing evidence to support his claim at the relevant stages in the state court proceedings. The inquiry, however, does not end there. Where a petitioner has been duly diligent in developing the record, courts look to the six-part test described in *Townsend v. Sain*, 372 U.S. 293, 83 S. Ct. 745, 9 L. Ed. 2d 770 (1963), as modified by *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 112 S. Ct. 1715, 118 L. Ed. 2d 318 (1992), and the AEDPA, to determine whether an evidentiary hearing is warranted.

In *Townsend*, the Supreme Court considered when a *habeas* petitioner is entitled to a plenary hearing in federal court. *Townsend* arose from the confession of the defendant, an admitted heroin addict, to a murder (among other things), immediately after he was injected with drugs by a police doctor, allegedly to ease Townsend's withdrawal symptoms. Townsend moved to suppress the confession on the basis that it had been coerced by the drug injection and was involuntary. The trial court denied the suppression motion and admitted the confession into evidence, but "made no findings of fact and wrote no opinion stating the grounds of his decision." *Townsend*, 372 U.S. at 302, 83 S. Ct. at 752. In the course of the trial, "additional noteworthy testimony was elicited" that tended to cast doubt upon Townsend's guilt. *See Townsend*, 372 U.S. at 303-04, 83 S. Ct. at 752-53. Nevertheless, the jury found Townsend guilty and he was sentenced to death. His conviction was affirmed on direct appeal. Townsend's post-conviction relief application was dismissed without evidentiary hearing, and the appellate court affirmed. *See Townsend*, 372 U.S. at 295, 83 S. Ct. at 748-49.

Townsend filed a timely petition for writ of *habeas corpus* in federal court. The Supreme Court described the petition's procedural history, noting:

> [The district court], considering only the pleadings filed in the course of that proceeding and the opinion of the Illinois Supreme Court rendered on direct appeal, denied the writ.

>The Court of Appeals for the Seventh Circuit dismissed [the] appeal. . . . [The Supreme Court] granted a petition for *certiorari*, vacated the judgment and remanded for a decision as to whether, in the light of the state-court record, a plenary hearing was required.
>
>On the remand, the District Court held no hearing and dismissed the petition, finding only that 'Justice would not be served by ordering a full hearing or by awarding any or all of (the) relief sought by Petitioner.' . . . On appeal the Court of Appeals concluded that '(o)n *habeas corpus*, the district court's inquiry is limited to a study of the undisputed portions of the record' and that the undisputed portions of this record showed no deprivation of constitutional rights.

*Townsend*, 372 U.S. at 296-97, 83 S. Ct. at 749 (citations omitted). The Supreme Court granted *certiorari* to review the standards applied by the lower courts in concluding Townsend was not entitled to an evidentiary hearing. After finding Townsend's petition alleged a deprivation of constitutional rights, the Court considered "whether the District Court was required to hold a hearing to ascertain the facts which are a necessary predicate to a decision of the ultimate constitutional question." *Townsend*, 372 U.S. at 309, 83 S. Ct. at 755.

In reviewing its historical decisions on the issue, the Court, as a preliminary matter, clarified:

>"By 'issues of fact' we mean to refer to what are termed basic, primary, or historical facts: facts 'in the sense of a recital of external events and the credibility of their narrators. . . .'" *Brown v. Allen*, 344 U.S. 443, 506, 73 S. Ct. 397, 446, 97 L. Ed. 269 [1953] (opinion of Mr. Justice Frankfurter). So-called mixed questions of fact and law, which require the application of a legal standard to the historical-fact determinations, are not facts in this sense.

*Townsend*, 372 U.S. at 310 n.6, 83 S. Ct. at 756 n.6. The Court then noted that its intent was to "elaborate [upon] the considerations which ought properly to govern the grant or

denial of evidentiary hearings in federal *habeas corpus* proceedings." *Townsend*, 374 U.S. at 310, 83 S. Ct. at 756.

The Court explained it consistently had "upheld the power of the federal courts on *habeas corpus* to take evidence relevant to claims of [unconstitutional] detention[,]" *Townsend*, 374 U.S. at 311, 83 S. Ct. at 756, and held:

> The rule could not be otherwise. The whole history of the writ – its unique development – refutes a construction of the federal courts' *habeas corpus* powers that would assimilate their task to that of courts of appellate review. The function on *habeas* is different. It is to test by way of an original civil proceeding, independent of the normal channels of review of criminal judgments, the very gravest allegations. State prisoners are entitled to relief on federal *habeas corpus* only upon proving that their detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution. Simply because detention so obtained is intolerable, the opportunity for redress, which presupposes the opportunity to be heard, to argue and present evidence, must never be totally foreclosed. *See Frank v. Mangum*, 237 U.S. 309, 345-350, 35 S. Ct. 582, 594-596, 59 L. Ed. 969 [1915] (dissenting opinion of Mr. Justice Holmes). It is the typical, not the rare, case in which constitutional claims turn upon the resolution of contested factual issues. Thus a narrow view of the hearing power would totally subvert Congress' specific aim in passing the Act of February 5, 1867, of affording state prisoners a forum in the federal trial courts for the determination of claims of detention in violation of the Constitution. The language of Congress, the history of the writ, the decisions of this Court, all make clear that the power of inquiry on federal *habeas corpus* is plenary. Therefore, where an applicant for a writ of *habeas corpus* alleges facts which, if proved, would entitle him to relief, the federal court to which the application is made has the power to receive evidence and try the facts anew.

*Townsend*, 372 U.S. at 311-12, 83 S. Ct. at 756-57.

The Court then considered the question of when an evidentiary hearing becomes mandatory. The Court found the "appropriate standard" to be as follows:

> Where the facts are in dispute, the federal court in *habeas corpus* must hold an evidentiary hearing if the *habeas* applicant did not receive a full and fair evidentiary hearing in a state court, either at the time of the trial or in a collateral proceeding. In other words a federal evidentiary hearing is required unless the state-court trier of fact has after a full hearing reliably found the relevant facts.

*Townsend*, 372 U.S. at 312-13, 83 S. Ct. at 757. The Court limited the standard, however, by noting:

> In announcing this test we do not mean to imply that the state courts are required to hold hearings and make findings which satisfy this standard, because such hearings are governed to a large extent by state law.
>
> The existence of the exhaustion of state remedies requirement . . . lends support to the view that a federal hearing is not always required. It presupposes that the State's adjudication of the constitutional issue can be of aid to the federal court sitting in *habeas corpus*.

*Id.* at n.9 (citations omitted).

Noting that "[s]ome particularization" of the test would be useful to federal *habeas* courts charged with its application, the Court set forth the following six circumstances in which federal courts *must* grant an evidentiary hearing to a *habeas* applicant:

> If (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the *habeas* applicant a full and fair fact hearing.

*Townsend*, 372 U.S. at 313, 83 S. Ct. at 757. The Court then went into considerable detail in explicating each of these circumstances, *see Townsend*, 374 U.S. at 313-19, 83 S. Ct. at 757-60, providing further direction to federal *habeas* courts in applying the new test which "substantially changed the availability of evidentiary hearings in federal *habeas* proceedings." *Keeney*, 504 U.S. at 5 n.2, 112 S. Ct. at 1717 n.2.

In summary, based on the authorities discussed above, if the court finds Williams failed to exercise diligence in developing the factual basis of his constitutional claim in the lower courts, then he is not entitled to an evidentiary hearing unless he meets the test set forth in 28 U.S.C. § 2254(e)(2). If the court finds Williams was diligent in his efforts in the State courts, then the court looks to see if any of the six *Townsend* factors would mandate an evidentiary hearing, or if not, then whether such a hearing nevertheless is warranted for this court to make a reasoned decision on Williams's *habeas* petition.

Williams's excuse for his lack of diligence in developing the factual basis for his claims is that his PCR counsel were ineffective in not presenting the evidence. Because there is no constitutional right to counsel in a PCR action, there can be no cognizable claim for ineffective assistance of PCR counsel in a *habeas* action. *See Burns v. Gammon*, 173 F.3d 1089, 1092 (8th Cir. 1999); *Cornell v. Nix*, 976 F.2d 376, 381 (8th Cir. 1992) (both citing *Coleman v. Thompson*, 501 U.S. at 752, 111 S. Ct. at 2566). Therefore, PCR counsel's failure to present this evidence at the PCR hearing cannot be grounds for an evidentiary hearing. Accordingly, Williams's request for an evidentiary hearing is **denied**.[6]

---

[6]This issue will be addressed again below, in connection with Williams's claim that he was denied effective assistance of counsel relating to his right to testify at his trial.

### III. EXHAUSTION AND PROCEDURAL DEFAULT

As a necessary precursor to federal review, a section 2254 petitioner first must provide the state courts with an opportunity to consider and rule upon any alleged violations of constitutional rights. 28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus . . . shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State[.]")  The State argues that most of Williams's claims are procedurally defaulted because he failed to exhaust his state court remedies.  The court agrees.

To exhaust his state court remedies, an applicant must "fairly present" his claims to the state court.  This means that in the state court the applicant must have referred to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue.  *See Abdullah v. Groose*, 75 F.3d 408, 411-12 (8th Cir. 1996).  As the court explained in *Frey v. Schuetzle*, 151 F.3d 893 (8th Cir. 1998):

> Before a federal court may reach the merits of a claim in a habeas petition by a state prisoner, it "must first determine whether the petitioner has fairly presented his federal constitutional claims to the state court."  *See Duncan v. Henry*, 513 U.S. 364, 365-66, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995) (*per curium*); *McCall v. Benson*, 114 F.3d 754, 757 (8th Cir. 1997).  "In order to fairly present a federal claim to the state courts, the petitioner must have referred to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue in a claim before the state courts."  *McCall*, 114 F.3d at 757 (internal quotations omitted).

*Id.*, 151 F.3d at 897; *see Middleton v. Roper*, 455 F.3d 838, 855 (8th Cir. 2006) ("Before a state prisoner is entitled to federal habeas corpus relief, he first must exhaust his state law remedies and fairly present the facts and substance of his habeas claim to the state

court."). Williams failed to "fairly present" to the Iowa courts most of the claims he is asserting here.

Furthermore, section 2254 requires a petitioner to exhaust *all* of his available state court remedies before coming to federal court. This means a petitioner is required to provide the highest state court with a full and fair opportunity to rule on the factual and theoretical substance of his claim. *Picard v. Connor*, 404 U.S. 270, 275-78, 92 S. Ct. 509, 512-14, 30 L. Ed. 2d 438 (1971). As the United States Supreme Court explained in *Baldwin v. Reese*, 541 U.S. 27, 124 S. Ct. 1347, 158 L. Ed. 2d 64 (2004):

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L. Ed. 2d 865 (1995) (*per curiam*) (quoting *Picard V. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971). To provide the state with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (***including a state supreme court with powers of discretionary review***), thereby alerting that court to the federal nature of the claim. *Duncan, supra*, at 365-366, 115 S. Ct. 887; *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999).

*Baldwin*, 541 U.S. at 29, 14 S. Ct. at 1349 (emphasis added). Failure to present claims to the state supreme court after an intermediate appellate court rejects them results "in a procedural default of those claims." *O'Sullivan v. Boerckel*, 526 U.S. 838, 848, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999). This is true even if review by the state supreme court is discretionary. *See Dixon v. Dormire*, 263 F.3d 774, 779-90 (8th Cir. 2001) (discretionary review by the state supreme court required to avoid procedural default).

In the Iowa court system, all appeals are presented first to the Iowa Supreme Court. The Supreme Court then decides whether to retain the appeal or transfer it to the Iowa Court of Appeals. If the appeal is transferred to the Iowa Court of Appeals, after the

Court of Appeals rules on the appeal, then the parties may apply to the Iowa Supreme Court for further review. The failure to seek further review by the Iowa Supreme Court constitutes a failure to exhaust that claim. *Armstrong v. Iowa*, 428 F.3d 924, 926 (8th Cir. 2005) ("failure to appeal the denial of state post-conviction relief to the Supreme Court of Iowa was a failure to exhaust."); *Sillick v. Ault*, 358 F. Supp. 2d 738 (N.D. Iowa 2005) (Reade, J.) ("In Iowa, exhaustion requires a petitioner to seek discretionary review from the Iowa Supreme Court after the Iowa Court of Appeals rejects an appeal argument."). Thus, any of Williams's claims that were denied by the Iowa Court of Appeals and not raised in an application for further review by the Iowa Supreme Court are procedurally defaulted.

In his direct appeal, Williams raised seven claims, but he asserted only three of those claims in his application for further review: (1) the trial court erred in refusing to instruct the jury concerning the unreliability of cross-racial identification; (2) the trial court erred in not suppressing the identification testimony of Sheyanne Oudekerk; and (3) the evidence was insufficient. The claims are included in Williams's section 2254 brief as Issues 1, 2, and 5, respectively. In his state PCR action, Williams advanced fourteen claims, but at the PCR trial, he abandoned all but four of the claims, and only those four claims were asserted in his PCR appeal and his application for further review of the court of appeals PCR decision. These four claims were (1) ineffective assistance of counsel in failing to object to the court's alternative theory instruction; (2) ineffective assistance of trial counsel in not seeking to enforce a plea agreement; (3) ineffective assistance of counsel in failing to discuss with Williams his constitutional right to testify on his own behalf; and (4) ineffective assistance of PCR counsel. The claims are included in Williams's section 2254 brief as Issues 6, 7, 8, and 16, respectively. Thus, of the sixteen issues raised by Williams in his section 2254 application, nine issues – Issues 3, 4, 9, 10, 11, 12, 13, 14, and 15 – are procedurally defaulted because they were never presented to the Iowa Supreme Court.

In addition to bringing issues before the state's highest court, a petitioner also must *properly* present the claims that are brought before the state's highest court. In a section 2254 action, federal courts may consider the petition "only on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Relief is not available to correct errors of state law. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991); *see Lewis v. Jeffers*, 497 U.S. 764, 780, 110 S. Ct. 3092, 111 L. Ed. 2d 606 (1990) ("federal habeas corpus relief does not lie for errors of state law").

To satisfy the exhaustion requirement, a section 2254 petitioner is required to have presented the specific federal constitutional right in question to the state court before coming to federal court. *Frey*, 151 F.3d at 897. A general invocation of "due process" or "the constitution" does not satisfy the exhaustion requirement. As the Eighth Circuit explained in *Abdullah v. Groose*:

> In order to present a habeas claim to the state court, a prisoner must "fairly present" not only the facts, but also the substance of his federal habeas corpus claim. *Anderson v. Harless*, 459 U.S. 4, 6, 103 S. Ct. 276, 277, 74 L. Ed. 2d 3 (1982) (*per curiam*). In this circuit, to satisfy the "fairly presented" requirement, Abdullah was required to "refer to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue" in the Missouri state court. *Ashker v. Leapley*, 5 F.3d 1178, 1179 (8th Cir. 1993) (internal quotation and citation omitted). Furthermore, presenting a claim to the state courts that is merely similar to the federal habeas claim is insufficient to satisfy the fairly presented requirement. *Duncan v. Henry*, 513 U.S. 364, [366], 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995) (per curiam).

*Id.*, 75 F.3d at 411-12; *see Gray v. Netherland*, 518 U.S. at 162-63, 116 S. Ct. 2074, 2081, 135 L. Ed. 2d 457 (1996) (fair presentation of due process claim requires more than

"a general appeal to a constitutional guarantee"); *White v. Dingle*, 267 Fed. Appx. 489, 492 (8th Cir. 2008) (non-specific and general reference to due process in state court challenge to jury instructions does not fairly present a due process claim to the state court); *Carney v. Fabian*, 487 F.3d 1094, 1096 (8th Cir. 2007) (federal due process violation must be specifically asserted in state court); *Sweet v. Delo*, 125 F.3d 1144, 1153 (8th Cir. 1997) ("Raising a state-law claim in state court that is merely similar to the constitutional claim later pressed in a habeas action is insufficient to preserve the latter for federal review."); *Morris v. Norris*, 83 F.3d 268, 270 (8th Cir.1996) (a habeas petitioner must have explicitly cited to the United States Constitution or federal case law in his direct appeal to preserve federal review); *Schleeper v. Groose*, 36 F.3d 735, 737 (8th Cir. 1994) ("perfunctory reference to due process without discussion does not bring the issue before this court").

Of the sixteen issues raised by Williams in his section 2254 application, seven – Issues 1, 3, 4, 10, 11, 13, and 16 – were presented to the Iowa courts as purely state law claims. Although in presenting the issues to the state courts Williams sometimes made passing references to federal due process, the Fourteenth Amendment, or the Sixth Amendment, he never "fairly presented" any constitutional questions. The court will discuss these seven issues individually to illustrate how Williams failed to "fairly present" them to the state courts.

**Issue 1.** Williams argues the trial court erred in refusing to grant his request that language be included in the jury instructions informing the jury of the unreliability of cross-racial eyewitness identifications. He acknowledges that issues relating to jury instructions in state court proceedings ordinarily involve the application and interpretation of state law. However, he argues that in this case, his federal due process rights were violated when the trial judge refused to include language in the jury instructions about the unreliability of cross-racial eyewitness identifications. He claims this "constituted 'a fundamental defect' that resulted in a 'complete miscarriage of justice, [or] an omission

inconsistent with rudimentary demands of a fair trial.'" Doc. No. 21, pp. 17-18 (citing *Louisell v. Dir. of Iowa Dept. of Corr.*, 178 F.3d 1019, 1022 (8th Cir. 1999), in turn citing *Estelle*, 502 U.S. at 67-68, 112 S. Ct. 475); *see Crump. v. Caspari*, 116 F.3d 326, 327 (8th Cir. 1997) (same).

In Jury Instruction 12, taken from Iowa Criminal Jury Instruction 200.45, the trial judge instructed the jury on four factors it should consider in evaluating eyewitness testimony:

> Eyewitness Identification. The reliability of eyewitness identification has been raised as an issue. Identification testimony is an expression of belief or impression by the witness. Its value depends on the opportunity the witness had to see the person at the time of the crime and to make a reliable identification later.
>
> In evaluating the identification testimony of a witness, you should consider the following:
>
> 1. If the witness had an adequate opportunity to see the person at the time of the crime. You may consider such matters as the length of time the witness had to observe the person, the conditions at that time in terms of visibility and distance, and whether the witness had known or seen the person in the past.
>
> 2. If an identification was made after the crime, you shall consider whether it was the result of the witness's own recollection. You may consider the way in which the defendant was presented to the witness for identification, and the length of time that passed between the crime and the witness's next opportunity to see the defendant.
>
> 3. An identification made by picking the defendant out of a group of similar individuals is generally more reliable than one which results from the presentation of the defendant alone to the witness.
>
> 4. Any occasion in which the witness failed to identify the defendant or made an inconsistent identification.

Williams's trial attorneys asked the judge to add a fifth numbered paragraph to the instruction stating the following: "If the witness and the person sought to be identified are different races, the difficulty witnesses have in accurately identifying persons of different races." Trial Tr. 798. The judge denied the request. Williams argues that in refusing to add this language to the eyewitness testimony instruction, the judge denied him the right to present the theory of his defense to the jury.

A defendant in a criminal case generally is entitled to a "theory of the defense" instruction if a timely request for the instruction is made. *United States v. Lewis*, 718 F.2d 883, 885 (8th Cir. 1983). Such an instruction must be supported by the evidence and set out a correct declaration of the law. *United States v. Manning*, 618 F.2d 45, 48 (8th Cir. 1980). Williams claims the language he asked the trial judge to include in the eyewitness testimony instruction constituted his theory-of-defense instruction. According to Williams, when the trial judge refused to include this language, he denied Williams his right to present the theory of his defense to the jury, which in turn denied him "his fundamental rights to due process, [and as a result, he was] harmed and prejudiced." Doc. No. 21, pp. 18-19.

Williams bases his argument on the premise that persons of one race have more difficulty identifying accurately persons of a different race. This contention has merit. The court agrees with those courts who have recognized the shortcomings in standard instructions on eyewitness identification, particularly in those involving cross-racial identifications. *See, e.g.*, *Brodes v. State*, 279 Ga. 435, 614 S.E.2d 766, 771 (2005) (finding jury instruction that jurors may consider the level of certainty of witness identification was erroneous in light of scientific evidence suggesting such a correlation is weak); *see also Arizona v. Youngblood*, 488 U.S. 51, 72 n.8, 109 S. Ct. 333, 345 n.8, 102 L. Ed. 2d 281 (1988) (Blackmun, J., dissenting) (cross-racial identifications are much less likely to be accurate than same-race identifications). However, whatever its merits, this

argument was never asserted in state court as a federal constitutional claim, so the court does not have the authority to review it here.

The only mention of a federal right in Williams's appellate brief with regard to this issue was the following statement: "When a Defendant is alleging error involving a constitutional right, the Court makes an independent evaluation of the totality of the circumstances to determine if such error was made." Appellant's Brief, *State v. Williams*, No. 99-1312, at 6 (Iowa Sup. Ct. July 27, 2000). He never indicated what that constitutional right might be. *Id*. at 5-14. In his application for further review, he made no reference whatsoever to a constitutional right. *See* Application for Further Review, *State v. Williams*, No. 99-1312, at 2-4 (Iowa Sup. Ct. Jan. 3, 2000). Because no due process argument was made in the state courts, the issue has been procedurally defaulted, and cannot be asserted in this court.

Even if a federal due process argument had been presented in state court, it would have failed. Williams's defense at trial was that he was not at the scene of the crime, and that Sheyanne Oudekerk was mistaken when she identified him as the person with Michael Williams and Mark Grieman shortly after the murder. Williams was permitted to present evidence to support this defense and to argue the defense to the jury during closing arguments. The instructions required the State to prove that Williams was the person who committed the offenses. Williams has cited no authorities to support his argument that the refusal of the trial judge to include the requested language in the instructions constituted a federal due process violation.

**Issue 3.** Williams argues the trial court erred in allowing testimony concerning his reaction and response to a hypothetical question by a police officer concerning another suspect's involvement in the case. In his brief, he argues the testimony was hearsay and

prejudicial. Doc. No. 21, p. 24. This argument does not raise a federal constitutional question.[7]

Hearsay is a state law objection, not a federal one. *Ashker v. Leapley*, 5 F.3d 1178, 1179-80 (8th Cir. 1993). The Iowa Court of Appeals decided the testimony in question was admissible under state law, holding it was not hearsay because it was not offered for the truth of the matters asserted. *Williams I*, 2000 WL 1827168 at 5. By asserting a hearsay objection, and then arguing that the evidence was prejudicial, Williams did not assert a claim under federal law. *See Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999) ("Our analysis [in a section 2254 case] is not dependent on whether a state court defines an out-of-court statement as hearsay, but on whether the statement violates the Sixth Amendment."); *see also Ashker v. Leapley*, 5 F.3d 1178, 1180 (8th Cir. 1993) (confrontation clause analysis is a separate analysis that does not necessarily overlap with a hearsay analysis). This court lacks the authority to review a state court's interpretation of state law. *Evenstad v. Carlson*, 470 F. 3d 777, 782 (8th Cir. 2005). As the court held in *Garcia v. Mathes*, 474 F.3d 1014 (8th Cir. 2007):

> In the habeas context, "[q]uestions regarding admissibility of evidence are matters of state law." *Rousan v. Roper*, 436 F.3d 951, 958 (8th Cir. 2006) (quotation omitted). "A federal issue is raised only where trial errors infringe on a specific constitutional protection or are so prejudicial as to amount to a denial of due process." *Bucklew v. Luebbers*, 436 F.3d 1010, 1018 (8th Cir. 2006). "The [applicant] must show that the alleged improprieties were so egregious that they fatally infected the proceedings and rendered his entire trial fundamentally unfair." *Rousan*, 436 F.3d at 958-59 (quotation omitted).

*Garcia*, 474 F.3d at 1017.

---

[7]Williams does not raise this issue under *Crawford v. Washington*, 541 U.S. 36, 60, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

Williams has made no showing that the holding of the Iowa Court of Appeals was erroneous, or that any error in the application of the hearsay rule in the state court was egregious, or that the holding "rendered his entire trial fundamentally unfair." *Rousan v. Roper*, 436 F.3d 951, 958-59 (8th Cir. 2006). Furthermore, the issue is procedurally defaulted because it was not raised as a federal issue in Williams's appellate briefs or in an application for further review by the Iowa Supreme Court.

**Issue 4.** Williams argues the trial court erred in allowing testimony of an alleged crack cocaine drug sale by Williams because the evidence "was irrelevant and highly prejudicial." Doc. No. 21, p. 25. "Relevance" is a state law objection, not a federal one. *See Johnston v. Luebbers*, 288 F.3d 1048, 1056 (8th Cir. 2002) ("in habeas corpus proceedings, it is not within our province to reexamine state-court determinations on state-law questions."). Allegations of "prejudice" add nothing to the argument. Usually, the best evidence is the most prejudicial evidence. Furthermore, as discussed above, the issue is procedurally defaulted because it was not presented to the Iowa Supreme Court in an application for further review.

**Issue 10.** Williams argues the trial court erred in instructing the jury on joint criminal conduct. No violation of a federal right is claimed. Furthermore, as discussed above, the issue is procedurally defaulted because it was not presented to the Iowa Supreme Court in an application for further review.

**Issue 11.** Williams argues the trial court erred in presenting marshaling instructions to the jury that were "based solely on what someone else did, not what he did." Doc. No. 21, p. 39. This claim appears to be the same as the claim made in Issue 10. Again, Williams makes no federal claim in connection with the issue. Furthermore, as discussed above, the issue is procedurally defaulted because it was not presented to the Iowa Supreme Court in an application for further review.

**Issue 13.** Williams argues the trial court erred in failing to instruct on and define the terms "theft" and "dangerous weapon." Again, this is a state claim, not a federal one.

Furthermore, as discussed above, the issue is procedurally defaulted because it was not presented to the Iowa Supreme Court in an application for further review.

**Issue 16.** Williams argues his postconviction counsel were ineffective. However, he concedes there is no basis for this claim under federal law. Doc. No. 21, p. 47 (citing *Coleman v. Thompson*, 501 U.S. 722, 752-54, 111 S. Ct. 2546, 2566, 115 L. Ed. 2d 640 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings.")).

It is well settled that "[t]here is no constitutional right to an attorney in state post-conviction proceedings." *Coleman v. Thompson*, 501 U.S. at 752, 111 S. Ct. 2546 (citations omitted); *see Pennsylvania v. Finley*, 481 U.S. 551, 557, 107 S. Ct. 1990, 95 L. Ed. 2d 539 (1987) (the Constitution does not guarantee the existence of state post-conviction proceedings). Consequently, a claim of ineffective assistance of post-conviction counsel is not available in these proceedings. *See Wainwright v. Torna*, 455 U.S. 586, 102 S. Ct. 1300, 71 L. Ed. 2d 475 (1982) (where there is no constitutional right to counsel there can be no deprivation of effective assistance); *Simpson v. Norris*, 490 F.3d 1029, 1033 (8th Cir. 2007) (same).

Because Issues 1, 3, 4, 10, 11, 13, and 16 all are premised on alleged errors of state law, they are not available in this section 2254 action.

## IV. WILLIAMS'S REMAINING CLAIMS

After applying the principles of exhaustion and procedural default, the following five claims remain: **Issue 2** (the state courts erred in not suppressing the identification testimony of Sheyanne Oudekerk); **Issue 5** (sufficiency of the evidence); **Issue 6** (the state courts erred in not finding ineffective assistance of trial counsel based on counsels' failure to object to the trial court's alternative theory instruction); **Issue 7** (the state courts erred in not finding ineffective assistance of trial counsel based on counsels' failure to seek to enforce a plea agreement); and **Issue 8** (the state courts erred in not finding ineffective

assistance of trial counsel based on counsels' failure to discuss with Williams his constitutional right to testify on his own behalf). The court will discuss the standard of review in this case, and then will address each of these five issues.

## A. Standard of Review

Williams brings this habeas corpus action under 28 U.S.C. § 2254. "[T]he essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and . . . the traditional function of the writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484, 93 S. Ct. 1827, 36 L. Ed. 2d 439 (1973).

Section 2254(a) provides, "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution . . . of the United States." A person is in custody in violation of the Constitution "if any consecutive sentence the prisoner is scheduled to serve was imposed as the result of a deprivation of constitutional rights." *Bobadilla v. Carlson*, 575 F.3d 785, 790 (8th Cir. 2009) (citing *Garlotte v. Fordice*, 515 U.S. 39, 41, 115 S. Ct. 1948, 132 L. Ed. 2d 36 (1995) (quoting *Peyton v. Rowe*, 391 U.S. 54, 64-65, 88 S. Ct. 1549, 20 L. Ed. 2d 426 (1968)).

Section 2254 provides, in part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*See Bobadilla*, 575 F.3d at 791. There are two categories of cases under section 2254(d)(1) in which a state prisoner may obtain federal habeas relief: (1) if the relevant state-court decision was "*contrary to . . .* clearly established Federal law, as determined by the Supreme Court of the United States," or (2) if the relevant state-court decision "involved an *unreasonable application* of . . . clearly established Federal law, as determined by the Supreme Court of the United States." *Williams v. Taylor*, 529 U.S. 362, 404-05, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000) (quoting 28 U.S.C. § 2254(d)(1) (emphasis added). A state court "violates the '*contrary to*' clause of section 2254(d)(1) if it 'applies a rule that contradicts the governing law set forth' by the Supreme Court or if the state court 'confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a [different] result.'" *Flowers v. Norris*, 585 F.3d 413, 416 (8th Cir. 2009) (emphasis added) (citing *Williams*, 529 U.S. at 406, 120 S. Ct. 1495). A state court can violate the "*unreasonable application*" clause of section 2254(d)(1) in two ways: (a) where "the state court identifies the correct governing legal rule from the [Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case"; or (b) where "the State court either unreasonably extends a legal principle from [Supreme] Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407, 120 S. Ct. 1495.

As explained by Judge Mark W. Bennett in *Jones v. Wilder-Tomlinson*, 577 F. Supp. 2d 1064 (N.D. Iowa 2008), "It is not enough that the state court applied clearly established federal law erroneously or incorrectly - the application must additionally be unreasonable." *Jones*, 577 F. Supp. 2d at 1073 (citing *Williams,* 529 U.S. at 411, 120 S. Ct. 1495; *Bell v. Cone*, 535 U.S. 685, 694, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002) ("an unreasonable application is different from an incorrect one.")). *See Ringo v. Roper*, 472 F.3d 1001, 1003 (8th Cir. 2007) (same). "Stated differently, a federal court may not grant the petition unless the state court decision, viewed objectively and on the merits,

cannot be justified under existing Supreme Court precedent." *Jones*, 577 F. Supp. 2d at 74 (citing *James v. Bowersox*, 187 F.3d 866, 869 (8th Cir. 1999)). To be overturned, the state court's application of federal law must have been "objectively unreasonable." *Collier v. Norris*, 485 F.3d 415, 421 (8th Cir. 2007) (citing *Lyons v. Luebbers*, 403 F.3d 585, 592 (8th Cir. 2005)).

Section 2254(d)(2) is violated if the state court proceedings resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. The federal court is to "presume that the state court's findings of fact are correct, and the prisoner has 'the burden of rebutting the presumption of correctness by clear and convincing evidence.'" *Christian v. Dingle*, 577 F.3d 907, 910 (8th Cir. 2009) (citing *Barnett v. Roper*, 541 F.3d 804, 811 (8th Cir. 2008) (quoting 28 U.S.C. § 2254(e)(1)); *see Miller-El v. Dretke*, 545 U.S. 231, 240, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005); *Weaver v. Bowersox*, 241 F.3d 1024, 1029-31 (8th Cir. 2001). A state court decision involves "an unreasonable determination of the facts in light of the evidence presented in the state court proceedings," as required by section 2254(d)(2), only "if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not enjoy support in the record." *Morales v. Ault*, 476 F.3d 545, 550 (8th Cir. 2007); *Jones v. Luebbers*, 359 F.3d 1005, 1011 (8th Cir. 2004) (same).

### B. Constitutionally Defective Eye-Witness Identification

Williams claims the trial court erred in not suppressing the identification of him by Sheyanne Oudekerk. The Iowa Court of Appeals ruled on this issue as follows:

> Williams next contends the district court erred in failing to suppress Oudekerk's identification of him because it was the product of an impermissibly suggestive photo array. Because Williams raises a constitutional issue, we make an independent evaluation of the totality of the circumstances. *State v. Taft*, 506 N.W.2d 757, 762 (Iowa 1993). We employ a two-step

process to analyze challenges to out-of-court identifications. *Id*. First, we consider whether the State employed an impermissibly suggestive procedure. *State v. Holderness*, 301 N.W.2d 733, 738 (Iowa 1981). Second, if such an impermissibly suggestive procedure was used, we then determine whether, under the totality of circumstances, the procedure created a very substantial likelihood of irreparable misidentification. *Id*. The critical question under the second step is whether the identification was reliable. *State v. Zahner*, 545 N.W.2d 337, 339 (Iowa App. 1996). The factors to be used in assessing reliability are: (1) the opportunity of the witness to view the suspect at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of her prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *State v. Lasage*, 523 N.W.2d 617, 620 (Iowa App. 1994).

Police officers showed two photo arrays to Oudekerk following the murder. The first was on August 6, 1998, and contained six pictures. Oudekerk indicated she knew five or six of the men in the pictures from her employment as a bartender. Williams was not pictured on the photo array and Oudekerk did not identify any of the men as the third man at her home the night of the murder. Oudekerk viewed a second photo array on September 27, 1998. That array also contained six pictures, including two photographs that had been in the first array. Williams's picture was among the six and Oudekerk immediately identified him, saying she was eighty to ninety percent sure he was the third man.

We must first consider whether the procedure used was impermissibly suggestive. Williams argues the photo arrays were impermissibly suggestive because Oudekerk knew several of the men pictured in the first array, and because two of the men appeared in both of the arrays. We conclude these facts did not render the photo arrays impermissibly suggestive. The record shows the arrays were prepared using standard police procedures and contained pictures of men who were similar in skin tone, hairstyle, build, and age. While two of the men were pictured in both arrays, different officers prepared the

arrays and the second officer testified he was not aware he was using some of the same pictures contained in the first array.

Williams also contends the array was impermissibly suggestive because Oudekerk knew he had been arrested for the crime before she saw the second photo array and she had seen him the day she identified him in the second array. We fail to understand how these facts show the second photo array was impermissibly suggestive or the identification was less reliable. Oudekerk had the opportunity to observe the third man at her apartment and in her car when she drove them to Fisher's apartment. Although the identification was two months after the crime, she identified Williams immediately, stating she was eighty to ninety percent sure he was the third man. She again identified him at trial. As we have determined the photo arrays were not impermissibly suggestive and the identification was reliable, the likelihood of "irreparable misidentification" was not substantial. The district court did not err in denying . . . Williams's motion to suppress Oudekerk's identification of him as the third man.

*Williams I*, 2000 WL 1827168 at *3-4.

The court must determine whether the decision of the Iowa court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). As stated above, a decision is contrary to federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court has on materially indistinguishable facts." *Bobadilla*, 575 F.3d at 791 (citing *Williams,* 529 U.S. at 413, 120 S. Ct. 1495).

The Iowa Court of Appeals analyzed this issue under the United States Constitution, but did not cite to any United States Supreme Court decisions. Instead, it relied on three Iowa cases, one from the Iowa Supreme Court, *State v. Holderness*, 301 N.W.2d 733 (Iowa 1981), and two from the Iowa Court of Appeals, *State v. Zahner*, 545 N.W.2d 337 (Iowa Ct. App. 1996), and *State v. Lasage*, 523 N.W.2d 617 (Iowa Ct. App. 1994). The first question is whether these state decisions are contrary to "clearly established Federal

law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The court finds they are not.

In *Holderness*, the Iowa Supreme Court addressed a claim that an identification resulted from impermissibly suggestive police procedures. The court analyzed the claim using a two-step process:

> We first consider whether an impermissibly suggestive out-of-court identification procedure was employed. *State v. Mark*, 286 N.W.2d 396, 403 (Iowa 1979). "If we find the procedure to be impermissibly suggestive, we must then determine whether, under the totality of the circumstances, the suggestive procedure gave rise to 'a very substantial likelihood of irreparable misidentification.'" *Id.* at 403-04 (quoting *Manson v. Braithwaite*, 432 U.S. 98, 116, 97 S. Ct. 2243, 2254, 53 L. Ed. 2d 140, 155 (1977)).

*Holderness*, 301 N.W.2d at 738. In *Zahner*, the Iowa Court of Appeals held that the critical question under the second step of the process is whether the identification was reliable. *Zahner*, 545 N.W.2d at 339. In *Lasage*, the Court of Appeals identified five factors to be used in assessing reliability. *Lasage*, 523 N.W.2d at 620.

Williams cites *Stovall v. Denno*, 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199, 1206 (1967), as setting out the "clearly established Federal law." In *Stovall*, the Supreme Court held that out-of-court identification procedures violate due process when they are "unnecessarily suggestive and conducive to irreparable mistaken identification." *Stovall*, 388 U.S. at 302, 87 S. Ct. at 1972. A determination under *Holderness* that out-of-court identification procedures were not "impermissibly suggestive" is the functional equivalent of a determination under *Stovall* that the out-of-court identification procedures were not "unnecessarily suggestive." A determination under *Holderness* that a suggestive out-of-court identification procedure was nevertheless reliable, and did not under the totality of the circumstances give "rise to a very substantial likelihood of irreparable mis-identification," would be consistent with a determination under *Stovall* that suggestive out-

of-court identification procedures were not "conducive to irreparable mistaken identification."

In *Manson v. Brathwaite*, 432 U.S. 98, 106, 114, 97 S. Ct. 2243, 2253, 53 L. Ed. 2d 140 (1977), the Supreme Court held that "reliability is the linchpin in determining the admissibility of identification testimony." In *Neil v. Biggers*, 409 U.S. 188, 199-200, 93 S. Ct. 375, 382, 34 L. Ed. 2d 401 (1972), the Court held that the determination of reliability depends on the "totality of the circumstances," which includes a consideration of such factors as "the opportunity of the witness to view the criminal at the time of the crime, the witness'[s] degree of attention, the accuracy of the witness'[s] prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." The Iowa authorities relied on by the Iowa Court of Appeals are consistent with these principles.

The next question is whether the decision of the Iowa Court of Appeals was contrary to or involved an unreasonable application of federal law. 28 U.S.C. § 2254(d)(1). Williams argues that the decision was premised on an unreasonable application of federal law to the facts. Doc. No. 21, p. 20; *see* 28 U.S.C. § 2254(d)(1). To support this argument, he recites his version of the facts, with citations to the record, and then concludes that "by allowing the testimony of Sheyanne Oudekerk, he was denied his fundamental rights to due process, harmed and prejudiced." Doc. No. 21, pp. 21-23.

To show that the Iowa Court of Appeals made "an unreasonable determination of the facts in light of the evidence presented in the state court proceedings," 28 U.S.C. § 2254(d)(2), Williams must establish "that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not enjoy support in the record." *Morales*, 476 F.3d at 550. The first photo array was shown to Oudekerk about ten days after the shooting. *See State v. Williams*, No. FECR 6435, Transcript of Hearing on Motion to Suppress at 6-8. The array was comprised of six photographs of African American males, and did not include a photograph of Williams. Oudekerk knew

most of the men in the pictures. The second array was shown to Oudekerk about two months after the shooting. The array again was comprised of six photos of young African-American males. Two of the photos were reused from the first array, both depicting people Oudekerk knew. One of the remaining four photos was of Williams. *Id*. at 10. When Oudekerk was shown the photos, she was advised as follows:

> I'm going to show you several photographs. Please keep an open mind. The person who committed the offense may or may not be among the pictures you are about to see. I am not allowed to help you. Keep in mind that hair styles, beards, and mustaches may be easily changed. Also, photographs may not always depict the true complexion of a person who may be lighter or darker than shown in the photo. Take your time and look at all the photographs before many any comment. Then, tell me if you recognize any of the persons in these photographs.

State's Suppression Hearing Ex. 6, p. 1. Oudekerk immediately selected the photo of Williams, and said she was "eighty to ninety percent" sure of her identification. *Id*. at 2.

Williams argues that when the second array was shown to Oudekerk, two of the possible choices had already been eliminated by her response to the first array. He claims that in the four remaining photos, some of the men were considerably older or had different facial hair or skin color than Williams. He also claims some of the choices were so dissimilar to Williams that they did not provide the witness with any real choice. Finally, Williams claims the background in the photo of Williams was different from the background in all of the other pictures.

The Iowa Court of Appeals found that the identification procedures employed in this case were not impermissibly suggestive and did not give rise to a substantial likelihood of irreparable misidentification. Williams has failed to show that this decision was contrary to or involved an unreasonable application of federal law. While the identification procedures used in this case were far from perfect, the deficiencies all were pointed out

to the jury during the trial. *See* Trial Tr. pp. 209-26. The jury had information it needed to determine the probative value of the identification.

Williams has failed to show that the decision of the Iowa Court of Appeals on this issue was objectively unreasonable. Accordingly, he is not entitled to relief on this claim.

## C. Sufficiency of the Evidence

Williams argues the evidence was insufficient to prove beyond a reasonable doubt that he aided and abetted in the murder and robbery. Doc. No. 21, pp. 27-29. The Iowa Court of Appeals ruled on this issue as follows:

> Williams next claims the evidence produced at trial was insufficient to support his convictions for first-degree murder and first-degree robbery. "A jury verdict is binding upon this court, and we must uphold the verdict unless the record lacks substantial evidence to support the charge." *State v. Arne*, 579 N.W.2d 326, 327-28 (Iowa 1998). In considering a challenge to the sufficiency of the evidence, we review all the evidence to determine whether a rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt. *See State v. Anderson*, 517 N.W.2d 208, 211 (Iowa 1994). Our review of the evidence is made in a light most favorable to the jury's verdict. *See State v. Knox*, 536 N.W.2d 735, 741 (Iowa 1995). "Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury was free to reject certain evidence, and credit other evidence." *Anderson*, 517 N.W.2d at 211. The credibility of witnesses, in particular, is for the jury: "[t]he jury is free to believe or disbelieve any testimony as it chooses." *State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993).
>
> Williams argues there was insufficient evidence to convict him of first-degree murder and first-degree robbery because the State failed to prove (1) he was the third man with Micheal Williams and Greiman on the night of the incident; (2) he aided and abetted in the commission of the robbery; and (3) the shooting which resulted in Vrchota's death could [sic]

have been reasonably expected to occur during the commission of the robbery.

The record indicates there was sufficient evidence to show Williams was the third man involved in the robbery and shooting at the Vrchota house. Witnesses placed Williams in the presence of Micheal Williams immediately before and after Vrchota's murder. Velena Taylor testified she saw Williams and Micheal Williams at a party together shortly before the robbery and murder took place. Oudekerk positively identified Williams as the man with Micheal Williams and Greiman at her apartment immediately after the incident. Greiman's girlfriend testified Williams knew Greiman and the day after the murder, she and Greiman found a distinctive necklace belonging to Williams in Micheal Williams's car. Williams also made several admissions during his police interrogation. He stated if he was going to prison, he should start lifting weights and then inquired about whether there were educational opportunities in prison. This testimony is buttressed by the fact Williams's fingerprints were found in Vrchota's house. The record contains sufficient evidence for a reasonable juror to conclude Williams was the third man involved in the robbery of Vrchota's house and the resulting murder.

Williams also argues there was insufficient evidence showing he knowingly aided and abetted Micheal Williams in committing the robbery. Aiding and abetting in a crime occurs when a person assents to or lends countenance and approval to another's criminal act either by active participation or by encouraging it in some manner prior to or at the time of commission. *State v. Wedebrand*, 602 N.W.2d 186, 189 (Iowa App. 1999) (citing *State v. Lott*, 255 N.W.2d 105, 107 (Iowa 1977)). The State must also prove the aider and abettor's participation or encouragement was done with the knowledge of the act. *State v. Speaks*, 576 N.W.2d 629, 632 (Iowa App.1998). We conclude the State provided substantial and sufficient evidence against Williams to allow the jury to determine he was guilty of aiding and abetting first-degree robbery and first-degree murder. A reasonable juror could find from the evidence in the record Williams entered the

Vrchota home in the middle of the night, dressed in black. He remained in the house after Micheal Williams drew a gun and ordered Bruce Vrchota into the room containing a cash box. Acting on orders from Micheal Williams, he stayed and watched over Vrchota's son, who was face down on the couch in the living room, until the shots were fired. After fleeing the house, he remained with Micheal Williams and Greiman as they drove away from the scene, abandoned the car, went to Oudekerk's apartment, and received a ride to another apartment where Micheal Williams hid the gun.

Finally, Williams contends the shooting death of Vrchota was not a foreseeable result of the robbery and the evidence was insufficient to convict him under a joint criminal conduct theory of liability. Iowa's joint criminal conduct statute provides:

> When two or more persons, acting in concert, knowingly participate in a public offense, each is responsible for the acts of the other done in furtherance of the commission of the offense or escape therefrom, and each person's guilt will be the same as that of the person so acting, unless the act was one which the person could not reasonably expect to be done in the furtherance of the commission of the offense.

Iowa Code § 703.2 (1997). The elements for imposing joint criminal liability are: (1) the defendant must be acting in concert with another; (2) the defendant must knowingly be participating in a public offense; (3) a "different crime" must be committed by another participant in furtherance of defendant's offense; (4) the commission of the different crime must be reasonably foreseen. *See State v. Hohle*, 510 N.W.2d 847, 848 (Iowa 1994). "In furtherance of" is not limited to acts done to promote or advance the underlying crime, but includes acts done "while furthering that offense." *State v. Satern*, 516 N.W.2d 839, 844 (Iowa 1994).

Williams and Micheal Williams entered Vrchota's house in the middle of the night, dressed in black. Vrchota was known for his successful marijuana growing business and his electronics

repair business. Vrchota was also known to keep cash from his businesses in his house. Greiman, a friend of Vrchota's, was acquainted with both Williams and Micheal Williams through various drug transactions. Greiman owed Micheal Williams money from previous cocaine sales. From the evidence presented at trial, a jury could infer Williams knew Micheal Williams was carrying a weapon when they entered the Vrchota house. In any event, Williams certainly knew Micheal Williams was carrying a gun when he pointed it at Vrchota and his son and ordered Williams to watch over Shelley when he took Vrchota to the office. A reasonable jury could conclude when Micheal Williams shot Vrchota in furtherance of the jointly planned and executed robbery, a separate crime was committed which could reasonably be expected under the circumstances. We conclude there was sufficient evidence to support Williams's convictions for first-degree robbery and first-degree murder.

*Williams I*, 2000 WL 1827168 at *7-8.

Williams argues this case "is [rife] with insufficient evidence that shows he aided and abetted or participated in joint criminal conduct in the murder and robbery of Bruce Vrchota." Doc. No. 21, p. 27. He relies on the holding of the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2791-92, 61 L. Ed. 2d 560 (1979), that a section 2254 applicant "is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."

In presenting his insufficiency-of-the-evidence argument in his direct appeal brief, Williams did not rely on either federal case law or federal due process. Instead, he reviewed the evidence, cited some state cases, briefly mentioned "due process," and then simply argued that the State had failed to prove its case.[8] *See* Appellant's Brief, *State v.*

---

[8]It appears from the record that the federal claim Williams is now asserting has been procedurally defaulted. The State does not, however, argue procedural default in response to this issue, so the court will proceed to address Williams's argument on the merits.

*Williams*, No. 99-1312, at 21-28 (Iowa Sup. Ct. July 27, 2000). As quoted above, the Iowa Court of Appeals engaged in a detailed analysis of the facts, and then, applying state law, concluded that the facts were sufficient to support the jury's verdict. *Williams I*, 2000 WL 1827168 at *7-8.

In order to challenge this holding, Williams would have to satisfy the requirements of section 2254. In the two pages in his brief devoted to this issue, he does not even mention these requirements. *See* Doc. No. 21, pp. 27-29. Instead, he cites several federal appeals court decisions on general principles of law, and one decision of the United States Supreme Court dealing with due process, *Jackson v. Virginia*. He then makes this argument:

> Based on the evidence presented at trial, the Iowa courts held the jury properly convicted Williams of first-degree murder and first-degree robbery. Williams argues that the evidence offered was insufficient to show he aided and abetted or that he participated in joint criminal conduct. In its ruling, the appellate court concluded that the State provided substantial and sufficient evidence against him to allow the jury to determine he was guilty of aiding and abetting first-degree robbery and first-degree murder. . . . It also determined that the jury could conclude that Michael Williams shot Vrchota in furtherance of a jointly planned and executed robbery.

> Williams argues that the evidentiary ruling regarding his denial of a motion for judgment of acquittal was so conspicuously prejudicial and of such magnitude, as to fatally infect the trial, thus depriving him of his due process rights. He additionally argues that, but for[] the jury instruction for aiding and abetting and joint criminal conduct, the jury would not have found sufficient evidence to find him guilty of robbery or murder.

> * * *

> Williams argues there was not proof beyond a reasonable doubt that he committed the crimes, that the lower court erred and as a result he was harmed and prejudiced. He

> is seeking a new trial and asks the court for a reversal on all
> counts.

Doc. No. 21, pp. 28-29.

Williams has not satisfied the requirements of section 2254. He has not shown that the Iowa Court of Appeals applied legal principles that were contrary to clearly established federal law as determined by the Supreme Court of the United States. *See Williams*, 529 U.S. at 404-05, 120 S. Ct. 1495. He has not shown that the court applied federal law in an objectively unreasonable manner in his case. *Id.*, 529 U.S. at 407, 120 S. Ct. 1495; *Jones*, 577 F. Supp. 2d at 74. He has not rebutted any of the court's findings of fact by clear and convincing evidence. *See Christian*, 577 F.3d at 910. Therefore, his claim of insufficiency of the evidence must fail.

In any event, the state court record contains sufficient evidence to support both the findings of the Iowa Court of Appeals and the jury's verdict.

### D. Ineffective Assistance of Counsel - Failure to Object to Alternative Theory Instruction

Williams claims his trial counsel were ineffective in not objecting to the trial judge's instructions providing the jury with the option of finding Williams guilty on alternative prosecution theories. The Iowa Court of Appeals ruled on this issue as follows:

> Williams first contends the trial court instructed the jury on alternate theories for which he was not properly apprised. He contends the postconviction court erred in failing to conclude both his trial and appellate counsel were ineffective in failing to object to this error.

> To prevail on a claim of ineffective assistance of counsel, Williams must show that his attorney's performance fell outside the normal range of competency, and the deficient performance so prejudiced his case as to give rise to a reasonable probability that, but for counsel's alleged errors, the outcome of the proceedings would have been different. *Dunbar v. State*, 515 N.W.2d 12, 15 (Iowa 1994). There is

a strong presumption counsel performed competently, and the claimant has the burden to prove counsel was ineffective. *Id.* An ineffective assistance of counsel claim may be dismissed if the defendant fails to prove either prong. *State v. Cook*, 565 N.W.2d 611, 614 (Iowa 1997). Williams argues his attorneys were ineffective in failing to object to the submission of the theories of aiding and abetting, joint criminal conduct, and felony-murder because the defense was not given sufficient notice of those theories prior to trial.

The purpose of an indictment or trial information is to apprise the defendant of the crime charged so the defendant may have the opportunity to prepare a defense. *State v. Grice*, 515 N.W.2d 20, 22 (Iowa 1994). If the State specifies one way of committing a crime the offense must be proved to have been committed in the way charged. *Id.* at 22-23. However, a trial information need not detail the manner in which the offense was committed. *Id.* at 22. Iowa courts also consider the minutes of testimony when determining the adequacy of the allegations to apprise the accused of the crime charged. *Id.* at 23.

Here, Williams was charged in the trial information with murder in the first degree in violation of Iowa Code section 707.2 (1997) and robbery in the first degree in violation of section 711.2. The State did not specify in its trial information whether it would proceed on theories of felony-murder, aiding and abetting, or joint criminal conduct. However, this was not required. *See Kyle v. State*, 322 N.W.2d 299, 307 (Iowa 1982) ("The State was under no obligation to specify in the information whether it would proceed on a theory of felony-murder or premeditation."); *State v. Rydel*, 262 N.W.2d 598, 601 (Iowa 1978) ("To have charged defendant as an aider and abettor in the county attorney's information would have been surplusage."). Because the theories of felony murder, joint criminal conduct, and aiding and abetting were supported by the evidence, the court properly submitted these theories to the jury. *Kyle*, 322 N.W.2d at 307.

*Williams II*, 2007 WL 108342 at *2.

Williams claims the State charged him with first degree murder and first degree robbery without advising him of the State's specific theories for the charges. He claims the first time he heard of the theories the State would be arguing to the jury was when he saw the jury instructions at the end of the case. Doc. No. 21, pp. 29-30. He argues his trial counsel were deficient in failing to object to the instructions, and his appellate counsel was deficient in not raising this deficiency of trial counsel on appeal. *Id*. at 30.

In *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court set out the principles to be applied by a court considering claims of ineffective assistance of counsel. Under these principles, a petitioner must show not only that his counsel's performance was inadequate, but that he was prejudiced by the deficient performance. It is not necessary that a court address the performance and prejudice prongs in any particular order, nor must both prongs be addressed if the court determines the petitioner has failed to meet one prong. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069. Indeed, the *Strickland* Court noted that "if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed." *Tokar v. Bowersox*, 198 F.3d 1039, 1046 (8th Cir. 1999) (citing *Strickland*).

Aside from boilerplate recitations of the standard legal principles, the following is the sum total of the argument asserted in Williams's brief:

> Clearly trial and appellate counsel were deficient and Williams was prejudiced by their in-action [sic]. If trial counsel had objected to the jury instructions which set forth the alternate theories, and the jury not been instructed regarding the theories at all, the outcome of the trial would have been different. Trial and counsel [sic] should have objected to the jury instructions and appellate counsel raised the issue on appeal.
>
> * * *
>
> Trial counsel only took exception with one jury instruction at trial. When the Court asked trial counsel if he had sufficient time to review the proposed instructions, trial

counsel responded, "Yes, Your Honor. The Defendant has no exceptions or objections to the instructions other than Instruction No. 12." . . . Not only should trial counsel have addressed the issue of the additional instructions with the court, he should have discussed the ramifications with Williams.

Williams is not arguing that the jury instructions do not correctly set forth the state law, but he argues that they were not applicable to his state court case. Because of their use and submission to the jury, he argues he was prejudiced and harmed and his due process rights and right to effective counsel were violated. He is seeking a reversal and new trial.

Doc. No. 21, pp. 31-32. Williams does not say which instructions should not have been given, or why a particular instruction was inappropriate in this case.

In any event, Williams has made no effort to show, as required by *Strickland*, that the failure of his attorneys to object to the instructions constituted deficient performance or resulted in any prejudice, and he does not even attempt to demonstrate why the decision of the Iowa Court of Appeals on this issue was contrary to federal law, as required by section 2254. For all of these reasons, this claim must fail.

### E. Ineffective Assistance of Counsel - Failure to Enforce Plea Agreement

Williams claims his trial counsel were ineffective in not seeking to enforce a plea agreement. The Iowa Court of Appeals ruled on this issue as follows:

The performance of a plea bargain agreement must be mutual. *State v. Aschan*, 366 N.W.2d 912, 917 (Iowa 1985). When a defendant fails to uphold his end of a plea bargain, the State has no obligation to provide defendant the anticipated benefits of that bargain. *Id*. Here, the plea agreement was contingent upon Williams providing a truthful proffer of testimony for the State's review. Numerous letters were exchanged attempting to finalize the plea agreement. Williams's attorney summarized the evidence he would provide on behalf of the State. If it was determined Williams was not being truthful in the proffer, the agreement would be "null and void." The

State determined that Williams was not being truthful, specifically citing his claim all three men were in the Vrochta home, he only went in the kitchen and living room, and that he didn't know Michael Williams had a gun. Because Williams did not comply with the terms of the plea agreement, the State withdrew the plea offer. We, like the trial court, also reject the contention that Williams detrimentally relied on the plea offer. He claims information disclosed to the prosecution during the plea negotiations prohibited him from using alibi as a defense. However, nothing supports this claim. His attorney denies the claim and other statements he made to the police during the investigation effectively eliminated alibi as a defense. Accordingly, trial counsel did not breach an essential duty in failing to seek to enforce the plea agreement.

*Williams II*, 2007 WL 108342 at *3.

Williams claims he entered into a plea agreement with the State whereby he would be permitted to plead guilty to a lesser offense in exchange for testimony against his codefendants. He claims that after he gave statements detrimental to his interests, the State withdrew the offer. Doc. No. 21, p. 32. Based on these claims, Williams makes the following argument:

Williams argues that trial counsel was ineffective, and that but for trial counsel's deficiency, the outcome would have been different and the result more favorable to him. It is well-established that a breach of a plea agreement violates a defendant's due process rights. *United State v. Fowler*, 445 F.3d 1035, 1037 (8th Cir. 2006) (Citing *Santobello*, 404 U.S. at 262, 92 S. Ct. 495). Whether a promise is made in the context of a plea agreement is a question of fact. *United States v. Halford*, 948 F.2d 1054, 1056 (8th Cir. 1991). We review issues pertaining to the interpretation and enforcement of a plea agreement de novo. *United States v. Has No Horses*, 261 F.3d 744,750 (8th Cir. 2001).

"Plea agreements are contractual in nature, and should be interpreted according to general contract principles." *United States v. DeWitt* (8th Cir. 2004). "[W]here a plea agreement is ambiguous, the ambiguities are construed against

> the government." *United States v. Andis*, 333 F.3d 886 (8th
> Cir. 2003) (en banc) (quoting *Margalli-Olvera v. INS*, 43 F.3d
> 345, 353 (8th Cir. 1995)). Any promise made by the
> Government that constitutes a significant part of the
> defendant's inducement or consideration for making the plea
> agreement must be fulfilled to satisfy due process. *Santobello
> v. New York*, 404 U.S. 257, 262, 92 S. Ct. 495, 30 L. Ed. 2d
> 427 (1971); *United States v. Van Thournout*, 100 F.3d 590,
> 594 (8th Cir. 1996).

Doc. No. 21, p. 34.

The Iowa Court of Appeals specifically found that the State offered Williams a plea agreement contingent upon his providing a truthful statement, and if it was determined that Williams was not being truthful, the plea agreement would be "null and void." The State determined that Williams was not being truthful, and withdrew the offer. Williams has not shown, as required by *Strickland*, that the failure of his attorneys to seek enforcement of the plea agreement constituted deficient performance or resulted in any prejudice. Furthermore, Williams does not even attempt to demonstrate why the decision of the Iowa Court of Appeals on this issue was contrary to federal law, as he is required to do by section 2254. For all of these reasons, this claim must fail.

### F. Ineffective Assistance of Counsel - Failure to Advise of Right to Testify

Williams claims his trial counsel were ineffective in not advising him of his constitutional right to testify at the trial. The Iowa Court of Appeals ruled on this issue as follows:

> An accused has a constitutional right to testify. *State v.
> Reynolds*, 670 N.W.2d 405, 411 (Iowa 2003). Like other
> constitutional rights, the right to testify may be waived if done
> so "voluntarily, knowingly, and intelligently." *Id*. Although
> trial strategy plays a large role in whether a defendant testifies,
> the decision is for the defendant - not defense counsel - to
> make. *Id*. Trial counsel's role is simply to provide advice to

49

the defendant to enable the accused to make a well-informed decision. *Id*.

We, like the trial court, conclude Williams's waiver of his right to testify was not knowingly, voluntarily, and intelligently made. Neither of his trial attorneys discussed the issue with him, each assuming the other had. Accordingly, counsel failed to perform an essential duty.

However, we agree with the postconviction court's assessment that prejudice for this failure has not been proven. The trial court stated:

> The court concludes that the outcome of the case would not have been different had Williams testified and thus he did not suffer prejudice. Mr. Lapointe was likely correct in his assessment that Williams would have been "crucified" on cross-examination due to statements he made to Special Agent Basler. In particular, Williams presented an alibi to Basler that was shown to be untrue. Furthermore, Williams's necklace was in the car that was used to go to and from the crime scene. Additionally, his fingerprints were found at the crime scene. Finally, when told that Mark Grieman had been charged with first-degree murder, Williams had a strong reaction and made statements to the effect that if he was going to prison he had better start lifting weights and wondered out loud what educational opportunities would be available to him in prison. There is no reasonable possibility that had Williams testified he would have been able to overcome the evidence against him.

We adopt these findings as our own. We also note Williams's presence with his brother[9] and Grieman both immediately before and after the crime. Accordingly, we affirm the district

---

[9]Again, this is incorrect. Darnell Williams and Michael Williams are not related.

court's denial of Williams's application for postconviction relief.

*Williams II*, 2007 WL 108342 at *3-4.

Applying what was, in effect, the *Strickland* standards, the Iowa Court of Appeals found the performance by Williams's attorneys was deficient. They had an obligation to advise Williams of his right to testify at trial, and they failed to do so. This constituted a failure to perform an essential duty. The only remaining question under *Strickland* was whether Williams was prejudiced by his counsels' deficient performance. The Iowa Court of Appeals found he was not, adopting the PCR trial court's finding that there was no reasonable possibility that had Williams testified, he would have been able to overcome the evidence against him. This court must decide, as required by 28 U.S.C. § 2254(d)(2), whether this holding by the Iowa Court of Appeals was an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

In his brief, Williams failed to address the question of prejudice. The only statement on the subject in his brief is the following: "By not fully explaining his rights and allowing him to testify at his trial, counsel was ineffective and because of counsel's deficiencies, Williams has been harmed." Doc. No. 21, p. 36. Williams does not say what his testimony would have been, or how the fact that he did not testify resulted in prejudiced.

When this deficiency was pointed out to Williams at oral arguments, he offered to submit an affidavit to the court summarizing what his testimony would have been. On January 11, 2010, Williams filed a "Summary of Intended Trial Testimony." Doc. No. 42. In the "summary," he states the following:

> . . . I would have testified: at all times I assumed I was a suspect and, perilous or not, I was being "flippant" and a "smart-ass" with special Agent Basler. That my "alleged" strong reaction to Agent Basler's comments about "Mark Greiman driving the car - and-being charge[d] with murder," was not one of guilt – because I was not involved and had no

reason to have a "guilty" reaction. I reacted (if at all) over the fact that Agent Basler was telling me information about an ongoing murder investigation and another suspect's case. Again, Agent Basler seemed to think that "what [he] said," should have meaning to me. Thus, in "totally" being flippant – I said "so what are you saying? That I should lift weights, work on my education?" clearly, my version of what was said–is a little bit "different" than Agent Balser's [slanted] version.

\* \* \*

Additionally, I would have been able to testify that "Vrochta was [my] marijuana supplier." Which is why my print was found therein. Also, I did [not] know Mark Greiman. I knew [his] girlfriend – who always was the one to come in and buy dope from me. Finally, I would be able to testify that "I sold that [necklace] to Michael Williams at a party that night." Which is why – we "temporarily" left together, to handle that business, i.e., some dope for the necklace since he had no money.

*Id.* at 6, 7.

Nothing in this proffered testimony explains why Williams did not testify at the PCR hearing.[10] Furthermore, Williams has made no attempt to show the finding of the Iowa Court of Appeals that he was not prejudiced by the deficiencies of his trial counsel was unreasonable. In any event, Williams's proffered testimony does nothing to undermine the appellate court's analysis on this issue. William does not deny he was present at the scene of the shooting. He does not deny that he watched over Vrochta's son while Michael Williams took Vrochta into another room to get money and then shot him.

---

[10]In Williams's brief (Doc. No. 21), he states that he did not testify at the PCR hearing because of the ineffectiveness of PCR counsel. As discussed above, because there is no right to counsel in a PCR action, there can be no cognizable claim for ineffective assistance of PCR counsel. *See Burns v. Gammon*, 173 F.3d at 1092; *Cornell v. Nix*, 976 F.2d 376 at 381 (both citing *Coleman v. Thompson*, 501 U.S. at 752, 111 S. Ct. at 2566).

He does not deny that after the shooting, he drove with Michael Williams and Mark Greiman to another location where the gun was hidden.

After considering Williams's proffered testimony, the court finds he still has not shown the Iowa Court of Appeals's determination that he was not prejudiced by the deficiencies of his trial counsel was unreasonable. Williams's argument on this claim must fail.

## V. CONCLUSION

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[11] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1)(C) and Fed. R. Civ. P. 72(b) within fourteen (14) days of the service of this Report and Recommendation, that Williams's application for writ of habeas corpus be **denied**.

**IT IS SO ORDERED.**

**DATED** this 19th day of January, 2010.

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[11]Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).